Filed 9/11/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G044703 |
| v. | (Super. Ct. No. 07WF2103) |
| LUIS ALBERTO RAMIREZ et al., | O P I N I O N |
| Defendants and Appellants. | |

Appeal from a judgment of the Superior Court of Orange County, William Froeberg, Judge. Affirmed in part and reversed in part.

Laura G. Schaefer, under appointment by the Court of Appeal, for Defendant and Appellant Luis Alberto Ramirez

Allen G. Weinberg, under appointment by the Court of Appeal, for Defendant and Appellant Jose Roberto Armendariz.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A Natasha Cortina and Kelley Johnson, Deputy Attorneys General, for Plaintiff and Respondent.

1

Luis Alberto Ramirez and Jose Roberto Armendariz were tried together on two counts of murder arising out of a gang "hit-up" they carried out with a third participant, Luis Menchaca, who testified at the trial after reaching a plea agreement with prosecutors. Both Ramirez and Armendariz were 16 years old when the crimes were committed, and the jury returned verdicts of first degree murder against both on count 1 (Penal Code §§ 187, 189; all further statutory references are to this code unless otherwise designated) and second degree murder (§ 187) against both on count 2. The jury also found Armendariz guilty on a third count which alleged he was an active participant in a criminal street gang (§ 186.22, subd. (a)), a verdict also rendered against Ramirez in an earlier trial. The jury also found that both Ramirez and Armendariz committed the crimes for the benefit of a criminal street gang and both vicariously discharged a firearm causing death. The jury also found true four special circumstances alleged against Ramirez only.

The prosecution's theory was that Ramirez was the actual shooter in the two murders, while Armendariz was guilty either as a direct aider and abettor of murder, or because murder was a natural and probable consequence of lesser crimes he intended to aid and abet. The court sentenced Ramirez to state prison for life without the possibility of parole (LWOP), plus 65 years to life. The court sentenced Armendariz to state prison for 90 years to life.

Ramirez argues the court abused its discretion by ordering the cases consolidated for trial, and thereafter denying motions to sever them, since he and Armendariz were relying on inconsistent and antagonistic defenses. Armendariz joins in that argument. One of the tensions in the joint trial surrounded the issue of admitting evidence of prior incidents in which Armendariz had been the alleged shooter: Ramirez favored admission of the prior incidents and relied on them to suggest Armendariz was the actual shooter in the incident at issue in this case; by contrast, Armendariz opposed admission and on appeal asserts the court abused its discretion by allowing it.

Ramirez also claims the prosecutor engaged in misconduct, while Armendariz claims his own counsel was ineffective. Both defendants assert instances of instructional error and both argue their sentences constituted cruel and unusual punishment. We affirm Ramirez's convictions, but reverse Armendariz's conviction of first degree murder on count 1.

We find Ramirez's assertion the court erred by refusing to sever the cases for trial, as well as his claim of prosecutorial misconduct, to be without merit. We also reject Armendariz's assertion the court erred by allowing the jury to consider evidence of his prior uncharged acts. But we agree with Ramirez's contention the court erred by instructing the jury it could not consider evidence of Armendariz's prior uncharged acts for purposes of Ramirez's defense, unless it *first determined* those prior incidents had been *proven true* by a preponderance of the evidence. As Ramirez argues, it is the *prosecutor's burden* to prove guilt beyond a reasonable doubt; requiring a defendant to prove facts which tend to undermine the elements of the crime charged against him by a preponderance of the evidence is inconsistent with that burden. Moreover, the instruction was flawed for another reason as well, in that it erroneously informed the jury its consideration of the evidence in connection with Ramirez's defense was *optional*. While the jury is certainly free to weigh the evidence before it, it is not free to simply disregard evidence which tends to cast doubt on the prosecution's case. We conclude, however, that the instructional error was not prejudicial to Ramirez, and as a consequence, it does not qualify as a basis for reversing his convictions.

We also agree with Armendariz's contention that the court erred in its instruction to the jury on both direct aider and abettor liability and the natural and probable consequences doctrine. Direct aider and abettor liability is based on the mental state of the aider and abettor – he must have *personally* premeditated a murder in order to be convicted as an aider and abettor of a premeditated murder. Here, the instructions did not adequately inform the jury that Armendariz's culpability for first degree murder as a

3

direct aider and abettor must be based on *his own premeditation*, and not on the premeditation of Ramirez.

The natural and probable consequences doctrine, by contrast, assumes the aider and abettor intended only to commit some lesser crime, and hence precludes his *personal* premeditation of a charged murder. Thus the potential culpability of an aider and abettor for premeditated murder under the natural and probable consequences doctrine depends on the premeditation *of the perpetrator* and necessarily hinges on whether a reasonable person in his position should have known that the perpetrator's commission of *premeditated* murder was a natural and probable consequence of the lesser crime the aider and abettor intended to commit. Here, the jury was asked only to determine whether *murder* was a natural and probable consequence of one or more of the lesser crimes intended by Armendariz; it was not asked to determine whether Ramirez's *premeditation* of that murder was also a natural and probable consequence. Absent a factual finding that Ramirez's premeditation of the murder was part of the natural and probable consequences of the lesser crime(s) intended by Armendariz, Armendariz cannot be held culpable for that premeditation. Because the jury instructions on these points were flawed, the jury's verdict of first degree murder against Armendariz on count 1 must be reversed.

Finally, we conclude the sentences imposed on both defendants amounted to cruel and unusual punishment, in light of their youth at the time of the crimes. We consequently reverse both sentences and remand the case to the trial court with directions to (1) resentence Ramirez to a term which allows him a meaningful opportunity to obtain release within a reasonable period based on demonstrated maturity and rehabilitation, and (2) resentence Armendariz to a term which allows him a similar opportunity, after it resolves count 1 alleged against him.

FACTS

*1. The Shooting*

On August 27, 2007, just after midnight, Oliver Martinez and Michelle Miller were shot dead – only moments after they had the misfortune of encountering Ramirez, Armendariz, Menchaca and Ramirez's girlfriend, Diane Estrada.

Earlier in the evening, Menchaca, who was 18 at the time, met up with Ramirez and Armendariz, both age 16, at the home of another friend. All three of them, along with two other males who were also present in the home, were members of a gang known as Down Crowd. Armendariz, who is left-handed, had a cast on his left hand that evening, as a result of breaking several fingers in a fall from his bicycle. During the visit, they passed around a .38 caliber gang gun, after which Ramirez put it into his pocket. The group then went to the home of a different friend, where they consorted for awhile before Menchaca, Ramirez, Armendariz and Estrada decided to walk to a restaurant to get some food.

As the group walked over a freeway overpass, Menchaca saw a man and a woman – Martinez and Miller – walking onto the overpass behind them. Menchaca stopped and pretended to tie his shoe while the others waited, so that the man and woman would pass them. As they passed, Menchaca recognized the man as a member of Crow Village – a rival gang. After the couple passed, Menchaca said to the others, "Lets go hit them up," which means to ask someone what gang they belong to.

The group then approached Martinez and Miller, and Menchaca called out "Ay" to get their attention. When Martinez turned around, Menchaca asked him if he had a lighter. At this point, Ramirez was standing next to Menchaca, while Armendariz and Estrada were standing approximately a foot behind them. Martinez then responded "Aren't you that pussy from dick cravers?" – using a derogatory term for Down Crowd to convey disrespect. Menchaca replied "Fuck Crow"; Ramirez pulled out the .38 and shot

5

Martinez, then Miller, and then shot Martinez again multiple times. Both Martinez and Miller were killed.

Menchaca, Ramirez, Armendariz and Estrada all ran back across the overpass, and while they ran, Estrada called a friend to come pick them up. Menchaca told Ramirez to give him the expended rounds from the gun, and he then dug a small hole in the dirt and buried them. While Menchaca was doing that, Ramirez reloaded the gun. The four then continued walking while they waited for their friend to arrive. Just about the time their friend arrived, a police car drove up. The officer inside trained his searchlight on the group and told them to stop. Menchaca and Armendariz ran, although Armendariz stopped for a moment next to a parked car and hid the .38 under one of its tires. Ramirez and Estrada remained where they were, although the officer saw Ramirez throw something.

Menchaca and Armendariz were apprehended shortly thereafter, hiding in some bushes in a nearby backyard. After other officers arrived, the first officer searched the area where he had seen Armendariz stop next to the parked car, and retrieved the .38. He also searched the area where he had seen Ramirez throw something, and found a pair of black gloves in a hedge. DNA found on one of the gloves was consistent with Ramirez. DNA found on the gun was consistent with all three, and both Menchaca and Ramirez had a small amount of gunshot residue on their right hands. Armendariz, whose dominant hand was in a cast, was not tested for gunshot residue.

2. *Menchaca's Plea Deal and Ramirez's Initial Trial*

Menchaca, the only adult in the group, was charged with two counts of murder along with Ramirez and Armendariz. He subsequently entered an agreement to plead guilty to lesser charges and receive a sentence of 16 years in prison, in exchange for his testimony against the others.

The prosecution initially chose to try Ramirez and Armendariz separately and successfully moved to have their cases severed. The first trial proceeded against Ramirez alone, and Menchaca testified on behalf of the prosecution. Over the objections of prosecutors, Ramirez was allowed to question Menchaca about prior shooting incidents involving Armendariz. After Menchaca initially refused to answer those questions, the prosecution, out of concern his testimony would otherwise be stricken, granted Menchaca immunity for his own involvement in those incidents. The jury in that first trial convicted Ramirez of active participation in a street gang, but could not reach a verdict on either of the two murder counts. The court declared a mistrial.

*3. The Consolidated Trial of Ramirez and Armendariz*

Following the mistrial in Ramirez's case, the prosecution moved to consolidate his case with Armendariz's for trial. The motion to consolidate was premised on the evidence of prior uncharged shooting incidents involving Menchaca and Armendariz, which Ramirez had brought out through Menchaca's testimony in the first trial. Although the prosecution had objected to consideration of those prior incidents evidence in Ramirez's first trial, it argued it would be able to rely on that evidence of earlier shooting incidents in a joint trial, as a means of establishing both defendants' "motive, intent, knowledge, malice and common scheme or plan in committing the murders charged in this case." Although the consolidation motion was opposed by both defendants, it was granted. Thereafter, both defendants moved to sever their trials, and the court denied those motions.

Over Armendariz's strenuous objection, the court ruled that evidence of the three prior uncharged shooting incidents Menchaca had testified to during Ramirez's first trial would also be admitted in the joint trial.

In addition to describing those prior uncharged incidents, Menchaca also testified about the crimes at issue in this case; he admitted his own involvement and

7

identified Ramirez as the shooter. Armendariz then testified in his own defense; Ramirez did not.

In his testimony, Armendariz denied being a member of Down Crowd, although he acknowledged attending some of its parties. He also denied involvement in any of the three prior uncharged acts. Armendariz acknowledged being present on the night of the shootings at issue, but claimed he had no idea any shooting might occur when he agreed to go get something to eat with Menchaca. He admitted he later went along with Menchaca's suggestion they hit up their two victims, but claimed he believed they would do nothing more than beat them up if they proved to be gang affiliated. Armendariz's mother also testified, and stated that while Armendariz had the cast on his left hand, he could neither write nor hold a spoon with that hand.

The jury found both defendants guilty of murder on counts 1 and 2, and with respect to both, it "further . . . affix[ed] the degree thereof" as "Murder in the First Degree" on count 1, and "Murder in the Second Degree" on count 2, but without revealing how it arrived at those verdicts.

At the sentencing hearing, counsel made brief arguments, and Armendariz addressed the court directly. Before pronouncing sentence, the court made a brief statement regarding gangs: "I think society as a whole is fed up with several things, sexual assaults against children, drivers driving intoxicated that kill people, and gang violence. And there have been rather substantial changes in the law to try to convince people that those things will not be tolerated in society. [¶] *It is no secret that the State of California is at war with gangs. It is no secret that anyone who joins a gang that they are likely to be shot, killed, stabbed or end up in prison for the rest of their lives*. Why in the world someone would join a gang is beyond my comprehension. [¶] The greatest writer in the English language, William Shakespeare, wrote about gangs in Romeo and Juliet. Unfortunately, they've been with us forever. Some people get it, some don't. Those who don't get it, unfortunately suffer the consequences." (Italics added.)

8

The court then pronounced sentence. As to Ramirez, it stated that "the only sentence option" for the first degree murder conviction is "a term of life without the possibility of parole." It then imposed sentence as follows: "Defendant Ramirez is hereby sentenced to a term in state prison of life without the possibility of parole on count one. The defendant is sentenced to a *consecutive term* of 25 years to life in the state prison for the enhancement under 12022.53(d) and (e)(1). [¶] Defendant is sentenced on count two to a *consecutive* indeterminate term of 15 years to life and to a *consecutive* term of 25 years to life for the 12022.53(d) and (e)(1) enhancement. [¶] The 186.22(b) enhancement is stricken for sentencing purposes for both counts one and two because the defendant is sentenced to life without possibility of parole. [¶] Sentence on count three [street gang participation] shall be the midterm of two years. However, such sentence is stayed pursuant to Penal Code section 654." (Italics added.) The net sentence imposed was LWOP, plus 65 years to life.

The court then sentenced Armendariz as follows: "[O]n count one to a term of 25 years to life in the state prison along with a *consecutive* term of 25 years to life for the 12022.53(d) and (e)(1) enhancement. [¶] On count two, the defendant's sentenced to a *consecutive* term of 15 years to life in the state prison together with a *consecutive* term of 25 years to life for the 12022.53(d) and (e)(1) enhancement. [¶] The 186.22(b)(1) enhancement for each count is stricken pursuant to Penal Code section 12022.53(e)(2). As to count three [street gang participation], defendant is sentenced to the midterm of 14 years. However, that sentence is stayed pursuant to Penal Code section 654." (Italics added.) The net sentence imposed was 90 years to life.

DISCUSSION

*1. Admissibility of Prior Incidents Evidence Against Armendariz*

We begin with Armendariz's contention the court prejudicially erred by allowing the jury to hear evidence of the three prior uncharged acts, in which Menchaca had described him as being the actual shooter in prior gang "hit up" scenarios. Only Armendariz opposed admission of this evidence; Ramirez favored admission because he viewed the evidence as supporting his contention that Armendariz was the actual shooter in this case as well.

According to Menchaca's testimony, the first uncharged incident occurred around July 2007. Menchaca testified he went with Ramirez and Armendariz to a high school in a rival gang area, carrying the .38 and planning to shoot at rival gang members. Ramirez waited near some houses while Menchaca and Armendariz approached some young males. Armendariz asked them "do you want to die?" while Menchaca said "Fuck Tacos." Armendariz then shot the gun, although no one was injured. Jose Ceja, an associate of the Hard Times gang, also testified about the incident. He stated he was with two friends when two males standing behind some bushes began shouting at them, asking where they were from. At some point, the two males were joined by a third. When Ceja replied "nowhere," he heard the males say "Do you want to die" before hearing a gunshot. He then heard "Fuck Tacos. Down Crowd," as he and his friends ran. Ceja could not identify any of the males.

The second uncharged incident occurred in August 2007. According to witness John Smith, he heard several gunshots a few houses away from his home. He claimed the shots sounded like they came from a .38 gun. After an officer arrived at the scene, several Wicked Ones gang members were arrested, and officers also discovered graffiti which suggested Wicked Ones gang members were showing disrespect to Down

10

Crown. Menchaca testified that Armendariz had told him he ran into some gang members in that same area and had engaged in a "shootout" with them.

The third uncharged incident occurred on August 25, 2007. Menchaca testified that he, Ramirez, Armendariz and two others drove into Hard Times territory with the .38, looking for rival gang members "to do them harm." When they spotted somebody near a wall, bending down, they thought he was "tagging the wall," Armendariz allegedly fired "one or two rounds." They then departed the neighborhood. Another witness, a resident of mobile home park in the area, also testified. He stated that on August 25, 2007, he heard gunshots in his neighborhood, and called the police. He later found that bullets had struck his mobile home.

Armendariz argues the court abused its discretion under Evidence Code section 352, because the evidence of these prior incidents, which he denied, was highly prejudicial and not particularly probative because there was no dispute as to his identity and participation in the incident at issue. He also argues the evidence was inadmissible under Evidence Code section 1101. We disagree.

Evidence Code section 1101, subdivision (a), states the general rule that "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion." However, subdivision (b) of that same statute creates an exception to the general rule: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . . ) other than his or her disposition to commit such an act." (Evid. Code § 1101, subd. (b).)

Armendariz acknowledges the evidence of the prior uncharged acts would have been admissible to establish any of these facts, but then simply asserts that "[n]one

11

of these things were at issue here because everyone put [him] at the scene of the crime, and there was ample evidence that [he] associated with the Down Crowd gang." But in the *immediately preceeding* paragraph of his brief, Armendariz admits the opposite when he claims "[t]he only truly disputed issue at trial was [his] level of culpability, i.e., *what was [his] intent . . . .*" (Italics added.) Exactly.

Although Armendariz did admit to being present when Martinez and Miller were murdered, and even admitted to going along with Menchaca's plan to carry out a "hit up," his primary defense to the charges leveled against him was the assertion he was personally unaware that anyone might actually be shot in the course of a gang hit up. He claimed his expectation was merely that a fistfight might ensue if the group encountered rival gang members. Consequently, while the fact that Armendariz participated in the incident was undisputed, his *intent in doing so* was anything but that.

Moreover, as the Attorney General points out, the evidence of the prior acts was also relevant to establish that Armendariz had knowledge of Down Crowd's pattern of criminal gang activity and that he intended to commit crimes for the benefit of the gang. These facts were directly relevant to count 3, which alleged Armendariz was an active participant in a criminal street gang.

In light of Armendariz's "intent" defense, the prior incident evidence, which reflected his participation *as the shooter* in earlier "hit up" efforts involving rival gang members is, if anything, quite probative. If believed, it severely undermined Armendariz's version of what he intended to occur during the course of the hit up on the night in question. It was consequently admissible under Evidence Code section 1101, subdivision (b).

And having conceded that his intent on the night in question was the *key disputed issue* with respect to his culpability, Armendariz also effectively concedes that the evidence of his prior uncharged acts was highly probative. We could not, as a

12

consequence, conclude the trial court abused its discretion under Evidence Code section 352 when it refused to exclude that evidence.

Evidence Code section 352 allows the court to exclude otherwise admissible evidence only after concluding "its probative value is *substantially outweighed* by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Italics added.)  Moreover, the statute "accords the trial court broad discretion" in making that determination (*People v. Clark* (2011) 52 Cal.4th 856, 893) and on appeal, "[w]e apply the deferential abuse of discretion standard when reviewing [the] trial court's ruling under Evidence Code section 352."  (*People v. Kipp* (2001) 26 Cal.4th 1100, 1121.)  Only when the record demonstrates "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice" will the court's ruling be reversed.  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

That standard represents a high bar, and of course it's Armendariz's burden on appeal to clear it.  (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 566.)  But because Armendariz's attempt to do so depended largely on his unpersuasive claim that the disputed evidence had no significant probative value on any issue for which it was even *admissible*, the attempt fails.

## 2.  Instructional Error on Prior Uncharged Acts

As we have already noted, Ramirez favored admission of the prior uncharged acts evidence – featuring Armendariz, and not him, as the shooter in earlier incidents – and relied on them as a means of undermining the prosecution's contention that it was he who was the shooter in this case.  Ramirez argues, however, the court improperly hampered that effort by its flawed effort to instruct the jury on the manner in

13

which it could consider that evidence. The Attorney General responds by claiming the contention was waived, because Ramirez failed to raise the issue in the trial court.

We conclude the issue was not waived because Ramirez's argument amounts to a contention that the instruction as given was not a correct statement of the law. Such a contention may be raised for the first time on appeal. (§ 1259; *People v. Smithey* (1999) 20 Cal.4th 936, 976-977, fn. 7.) In any event, "[a]s a general rule, an appellate court can reach a question a party has not preserved for review if the issue involves neither the admission nor the exclusion of evidence." (*People v. Gutierrez* (2009) 174 Cal.App.4th 515, 520.)

The challenged instruction, a modified form of CALCRIM No. 375, reflected an effort by the court to encompass both the prosecution's effort to use the prior acts evidence against Armendariz, as well as Ramirez's effort to rely on that same evidence in support of his defense. Thus, the first part of the instruction pertained specifically to use of the evidence against Armendariz, and properly reflected the standard rule limiting the jury's use of the uncharged acts evidence *against* a defendant.

The instruction then continued, by simply extending the rule which limited the jury's consideration of the evidence *against* Armendariz, to the jury's consideration of that same evidence in connection with Ramirez's *defense*: "The People have asserted that the defendant Luis Ramirez is the actual killer in this case. Mr. Ramirez is asserting that someone else is the actual killer. *If you decide by a preponderance of the evidence that the defendant Armendariz committed an uncharged offense*, you may *but are not required* to consider that evidence for the limited purpose of deciding whether or not Luis Ramirez was the actual killer in this case. [¶] Do not consider this evidence for any other purpose." (Italics added.)

Ramirez challenges this part of the instruction on the ground it improperly required the jury to first find the prior incidents to be true by a preponderance of the evidence, before it could even *consider* them for purposes of assessing his assertion that

14

he was not the actual shooter in this case. He claims it thus violated the basic burden of proof which pertains in a criminal case. He is correct.

As explained in *People v. Sherow* (2011) 196 Cal.App.4th 1296, even where defendant has the burden of proof on a defense, if that defense bears directly on the elements of the crime alleged and relates to his guilt or innocence, his burden is only to raise a reasonable doubt – he has no obligation to prove underlying facts by a preponderance of the evidence. "'[I]t is a cardinal rule in criminal cases that the burden rests on the prosecution to prove the offense beyond a reasonable doubt . . . , and it is error to deprive an accused of the benefit of the doctrine of reasonable doubt by giving an instruction that he has the burden of proving a defense by a preponderance of the evidence.' [Citation.] Further, as our Supreme Court [has] explained in holding that a defendant has the burden to raise a reasonable doubt in a murder case on any defense of mitigation, justification or excuse, '[a]ny other rule as to the weight of the evidence makes one measure applicable to one part of the case and a different one to another part, and leads to confusion.' [Citation.] [¶] . . . [¶] . . . [Thus] the reasonable doubt standard applies to a defense which, 'if established[,] would tend to overcome or negate proof of any element of the crime charged as otherwise established by the People.' [Citation.] The reasonable doubt standard applies to a defense that is 'not entirely collateral to the elements of the offense' [citation] and which 'relates to the defendant's guilt or innocence' [citation]." (*Id*. at pp. 1306-1307.)

Here, Ramirez's contention he was *not the shooter* related directly to the elements of the murders charged against him. Consequently, he was not required to prove any facts underlying that defense by a preponderance of the evidence before the jury could consider them. It was sufficient for his purposes if the evidence of prior shooting incidents simply left the jury uncertain about the identity of the shooter in *any* of the incidents – including this one. "Any relevant evidence that raises a reasonable doubt as to a defendant's guilt, 'including evidence tending to show that a party other than the

15

defendant committed the offense charged,' is admissible." (*People v. Avila* (2006) 38 Cal.4th 491, 577.) Consequently, the instruction stating the jury must first decide by a preponderance of the evidence that Armendariz committed the uncharged acts, before considering that evidence as support for Ramirez's defense, reflects an erroneous statement of the law.

The second problem with this instruction was it also told the jurors that even if they did find the prior acts evidence to be true by a preponderance of the evidence, they were nonetheless free to disregard it in assessing Ramirez's defense: "If you decide by a preponderance of the evidence that the defendant Armendariz committed an uncharged offense, you may *but are not required to* consider that evidence for the limited purpose of deciding whether or not Luis Ramirez was the actual killer in this case." (Italics added.) Giving the jury *the option* of considering the evidence, even if believed, contravened the principle that a jury is required to *consider* all of the evidence admitted in connection with a defense. The jury is not required to find that evidence persuasive, or even particularly material, but is required to consider it. (See *People v. Alcala* (1992) 4 Cal.4th 742, 804 ["For the purpose of instructing with respect to an alibi defense, it is sufficient that the jury be instructed generally to consider all the evidence . . . ."].) The instruction here was consequently flawed because it advised the jury it had the option of not considering credible evidence for the purpose of deciding whether Ramirez was the actual killer.

Nonetheless, we conclude the flawed instruction does not require reversal of the judgment against Ramirez. Because the instruction did not delineate or describe an element of the offense charged, "[r]eversal . . . is warranted only if, ""'after an examination of the entire cause, including the evidence' [citations], it appears 'reasonably probable' the defendant would have obtained a more favorable outcome had the error not occurred [citation]." [Citation.] The question is not what a jury *could* have done, but what a jury would *likely* have done if properly instructed.' [Citations.] '"In making that

16

evaluation, an appellate court may consider, among other things, whether the evidence supporting the existing judgment is so *relatively* strong, and the evidence supporting a different outcome is so *comparatively* weak, that there is no reasonable probability the error of which the defendant complains affected the result." [Citation.]'" (*People v. Larsen* (2012) 205 Cal.App.4th 810, 831.)

Here, the evidence that Ramirez, and not Armendariz, was the shooter was strong. The only witnesses who testified about the night in question, Armendariz and Menchaca, both identified Ramirez as the shooter. And while Ramirez portrayed Menchaca as particularly close to Armendariz, with a consequent motive to lie in an effort to protect him, that inference is a particularly difficult one to accept, given that Menchaca had no apparent difficulty in identifying Armendariz as the shooter in the prior incidents. Moreover, Ramirez had gunshot residue on his right hand after the shootings, and his DNA was found on one of the gloves he was observed throwing away in the wake of the murders. Finally, the undisputed evidence demonstrated that Armendariz, who was left-handed, had a cast on his left hand at the time of the shootings which impeded his ability to do even basic things with his dominant hand. That circumstance provided a fairly compelling basis for concluding that *even if* Armendariz had routinely wielded the gun in past hit-ups, it is unlikely he would have been doing so during the incident at issue.

In light of all the evidence, we conclude it is not reasonably probable that Ramirez would have obtained a more favorable outcome even if the jury had been properly instructed *to consider* the evidence of the prior uncharged shootings in evaluating Ramirez's claim that it was Armendariz, not he, who was the actual shooter.

17

*3. Severance*

Ramirez also argues that the court abused its discretion by granting the prosecution's motion to consolidate his case with Armendariz's case for trial, and thereafter denying motions to sever the cases.

In support of his severance motion, Ramirez argued that his defense in the initial trial had been premised on the assertion that it was Armendariz, not he, who had been the shooter, and that Menchaca, the prosecution's "star witness," had been motivated to lie for Armendariz because of their close friendship. Ramirez relied specifically on the evidence of prior shooting incidents involving Armendariz, which he had brought out through Menchaca's testimony in his first trial, over the objection of the prosecution. Ramirez characterized those prior incidents as establishing that Armendariz and Menchaca had a history of engaging in violent gang hit-ups together, in which Armendariz was the shooter, and thus as supporting the inference this case had come about in similar fashion.

Ramirez contended his theory of defense was fundamentally inconsistent with the defense anticipated from Armendariz, which would be a claim that Ramirez was the actual shooter and that he [Armendariz] had no idea any shooting would take place. As part of that defense, Armendariz would seek to deny and discredit any evidence that he had previously participated in violent crimes with Menchaca. Armendariz's motion was based on essentially the same argument. He contended he would be prejudiced if tried jointly with Ramirez because their defense theories were directly inconsistent, and because Ramirez would seek to introduce evidence of prior criminal incidents which Armendariz believed would otherwise be inadmissible against him.

In assessing whether the trial court erred by denying the severance motion, we start with the proposition that "[s]ection 1098 expresses a legislative preference for joint trials. The statute provides in pertinent part: 'When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be

18

tried jointly, unless the court order[s] separate trials.' [Citation.] Joint trials are favored because they 'promote [economy and] efficiency' and "'serve the interests of justice by avoiding the scandal and inequity of inconsistent verdicts."' [Citation.] When defendants are charged with having committed 'common crimes involving common events and victims as here, the court is presented with a '"classic case"' for a joint trial." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 40.)

Ramirez contends, however, that a joint trial is inappropriate where the two defendants have "antagonistic defenses," meaning "acceptance of one party's defense precludes the other party's acquittal." (*People v. Carasi* (2008) 44 Cal.4th 1263, 1296.) He claims that situation existed here, because the jury's acceptance of Armendariz's defense precluded it from acquitting him. We disagree.

In fact, the Supreme Court recently rejected this assertion in *People v. Souza* (2012) 54 Cal.4th 90 (*Souza*), a case involving remarkably similar facts. In *Souza*, the defendant sought to sever his trial from that of his co-defendant, because he expected that each would defend the case by claiming the other was the actual shooter. The Supreme Court concluded the court did not abuse its discretion in denying severance. "'[I]f the fact of conflicting or antagonistic defenses *alone* required separate trials, it would negate the legislative preference for joint trials and separate trials "would appear to be mandatory in almost every case."' [Citations.] [¶] 'Thus, "[a]ntagonistic defenses do not *per se* require severance, even if the defendants are hostile or attempt to cast the blame on each other." [Citation.]' [Citation.] '"Rather, to obtain severance on the ground of conflicting defenses, it must be demonstrated that the conflict is so prejudicial that [the] defenses are irreconcilable, and the jury will unjustifiably infer that *this conflict alone* demonstrates that both are guilty."'" (*Id.* at pp. 110-111, some italics added.) Consequently, the court reasoned that "[i]f 'there exists sufficient independent evidence against the moving defendant, it is not the conflict alone that demonstrates his or her guilt, and antagonistic defenses do not compel severance.'" (*Id*. at p. 111.) As we have

already explained, that was the case here.  There was sufficient independent evidence against Ramirez that it could never be said that it was the conflict between his and Armendariz's defenses which alone demonstrated his guilt.

In any event, "[e]ven if a trial court abuses its discretion in failing to grant severance, reversal is required only upon a showing that, to a reasonable probability, the defendant would have received a more favorable result in a separate trial." (*People v. Coffman and Marlow, supra* 34 Cal.4th at p. 41.)  Ramirez has made no such showing here.

*4.  Prosecutorial Misconduct in Arguing Corroboration*

Ramirez's final attack on his convictions is his assertion that the prosecutor committed prejudicial misconduct in her closing argument when she argued that the evidence of Armendariz's prior uncharged acts qualified as corroborating evidence of Menchaca's testimony, despite having agreed she would not do so.  We reject the assertion.

Ramirez explains that prior to closing arguments, he requested the court admonish the prosecutor not to assert that the evidence of the prior uncharged acts qualified as corroboration for Menchaca's testimony.  Apparently, Ramirez had in mind that the prior uncharged acts did not connect him with the commission of the charged murders, and thus would not qualify as required corroboration under section 1111, which states that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . ."  Although both the court and the prosecutor agreed those incidents could not be relied upon for such corroboration, Ramirez claims the prosecutor nonetheless attempted to do just that.

Specifically, Ramirez quotes the prosecutor as first describing Mechaca's testimony about the incident involving Ceja, before pointing out that Ceja himself also testified about that incident, and adding that "Menchaca's testimony is corroborated by

Mr. Ceja." The prosecutor did essentially the same thing with the other two uncharged incidents, pointing to Menchaca's testimony about them before noting that with respect to each incident, Menchaca's testimony was corroborated by the testimony of a third party.

Both defendants objected to the prosecutor's comments, claiming that by characterizing the third-party testimony as *corroboration*, the prosecutor was suggesting to the jury that they could also rely upon it as the *required* corroboration for Menchaca's testimony regarding the *charged crimes*. During a recess, the court directed the prosecutor to clarify the issue, which she did. When the prosecutor recommenced her argument, she immediately explained to the jury "When we were talking about the three prior acts for the purposes of the defendant's knowledge and intent, the corroboration to Menchaca's statements *was as to those prior acts*. I will talk about the corroboration *as to the act of the crime that we are here on* later . . . ." (Italics added.)

The Attorney General argues that the prosecutor's discussion of corroboration was wholly appropriate, and merely connected the independent corroborating evidence of the prior uncharged acts to those specific acts, and not to the crimes charged. Moreover, even if her attempt to do that had not been entirely clear in the first instance, her clarifying comments rectified any confusion. We agree. Even assuming the jurors might have been confused by the prosecutor's initial references to corroboration, when she later clarified that she had meant to refer only to corroboration of the prior acts themselves, and not of the crime charged, she cured the problem.

And while Ramirez suggests the prosecutor acted improperly by even pointing out the corroborating evidence on the uncharged acts, because she "did not need to establish the uncharged acts were independently corroborated," the suggestion makes little sense. The mere fact that corroboration is not required does not make it *prohibited*. The prosecutor committed no misconduct.

21

*5. Armendariz's Claims of Instructional Error*

The prosecution argued Armendariz, the non-shooter, could be convicted of the murders of Martinez and Miller under two alternative theories – either as a direct aider and abettor of the murders or because the murders were a natural and probable consequence of lesser crimes which Armendariz did intend to commit. The prosecutor made clear that the jurors need not agree unanimously on which theory applied, only that they must each find him culpable for the murders under one theory or the other.

Armendariz argues the court gave the jury flawed instructions with respect to both of the prosecution's theories, and thus his convictions on both murder counts must be reversed. Armendariz acknowledges his counsel did not object to these instructions at trial, but argues the issue was not waived, because the flawed instructions affected his substantial rights. (§ 1259.) We agree.

*a. Instructional error on culpability as a direct aider and abettor*

"Principals in the commission of a crime include both the direct perpetrator of the crime and those who aid and abet the commission of the crime. [Citations.] A person aids and abets commission of a crime when, with knowledge of the perpetrator's unlawful purpose, he, by act or advice, encourages or facilitates commission of the crime with the specific intent to do so." (*People v. Mejia* (2012) 211 Cal.App.4th 586, 606.) However, "the aider and abettor's guilt for the intended crime is not entirely vicarious. Rather, that guilt is based on a combination of the direct perpetrator's acts and the aider and abettor's *own* acts *and own mental state*." (*People v. McCoy,* (2001) 25 Cal.4th 1111, 1117, some italics added.)

Thus, the mental state of a person alleged to be an aider and abettor of the charged crime "must be at least that required of the direct perpetrator. 'To prove that a defendant is an accomplice . . . the prosecution must show that the defendant acted "with knowledge of the criminal purpose of the perpetrator *and* with an intent or purpose either

22

of committing, or of encouraging or facilitating commission of, the offense." [Citation.] When the offense charged is a specific intent crime, the accomplice must "share the specific intent of the perpetrator"; this occurs when the accomplice "knows *the full extent of the perpetrator's criminal purpose* and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." [Citation.]'" (*People v. McCoy, supra*, 25 Cal.4th at p. 1118, some italics added.)

It is against this background that we must evaluate Armendariz's assertion that the court erred by simply instructing the jury, pursuant to CALCRIM 400, that "A person is guilty of the crime whether he committed it personally or aided and abetted the perpetrator who committed it," without specifying that an aider and abettor's culpability is not *necessarily* coextensive with that of the perpetrator, and that a person who aided and abetted a crime could also be found culpable for a lesser crime than the perpetrator. Armendariz claims that absent such a specific instruction, the jury was invited to simply find him guilty of whatever crime it determined Ramirez had committed, on the basis that he was present and his presence facilitated the crime, but without regard to whether it believed he also *intended* to commit that crime. As a consequence, Armendariz argues that both his conviction of first degree murder on count 1 and his conviction of second degree on count 2, which mirrored the convictions of Ramirez, must be reversed.

The Attorney General disagrees, and contends that the very point Armendariz claims was lacking was made clear by the next instruction given to the jury; i.e., CALCRIM 401, which sets forth the *elements* of aider and abettor liability. The Attorney General characterizes this instruction as "direct[ing] the jury to determine whether Armendariz was guilty of first or second degree murder, or a lesser offense, based on his own mens rea, not Ramirez's." However, CALCRIM 401 – or at least the version of it given to the jury in this case – is not as clear as the Attorney General contends. It makes no reference at all to "first degree" murder, "second degree" murder, or "mens rea." Instead, the instruction simply states that the aider and abettor must both

23

"kn[o]w that the perpetrator intended to commit *the crime*," and "intend[] to aid and abet the perpetrator in committing *the crime*." (Italics added.) A separate instruction then characterizes the "crime" charged in counts 1 and 2 as "murder," without specifying any degree.

When these two instructions are *considered together*, as they must be (*People v. Smith* (2008) 168 Cal.App.4th 7, 13 ["We determine the correctness of the jury instructions from the entire charge of the court"]), we believe they do sufficiently inform the jury that Armendariz could not be found guilty of "the crime" of "murder" as a direct aider and abettor unless he knew Ramirez intended to commit *that crime*, and intended to aid and abet him in committing it.

But having said that, we note Armendariz was not simply convicted of "murder." On count 1, the jury convicted him of *first degree murder*, which the prosecutor argued was appropriate on the basis of premeditation. And as we have already mentioned, the version of CALCRIM 401 given in this case gave the jury no guidance on how to determine whether Armendariz, as an aider and abettor of murder, should be found guilty of *first degree* murder.

Instead, a different instruction addresses the distinction between first and second degree murder, explaining in abstract fashion that if the jury decides that "*a defendant* has committed murder," it must then "decide whether it is murder of the first or second degree." "[F]irst degree murder" is defined as one committed "willfully, deliberately, and with premeditation," and the jury is then instructed that "[t]he defendant acted with premeditation *if he decided to kill before committing the act that caused death*."

The abstract nature of this instruction creates a problem with respect to Armendariz, however, because the prosecution never alleged *he* "commit[ed] the act that caused death." It was *Ramirez* who was alleged to have fired the gun, and thus *Ramirez* whose "decision to kill" was deemed significant. Consequently, this instruction

24

effectively informed the jury that ascertaining the proper degree of murder would be dependent upon whether *Ramirez premeditated*.

Taken as a whole, then, the instructions essentially informed the jury that if Ramirez committed the crime of "murder," and Armendariz intended to facilitate the commission of *that crime*, then both are liable for *first degree* murder if the jury also believed *Ramirez* premeditated the murder. That is inconsistent with the law, because as we have already explained, Armendariz's culpability as a direct aider and abettor had to be based on his own intent, not that of Ramirez.

Moreover, we cannot say the flawed instruction was harmless beyond a reasonable doubt. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1165.) While we agree there was sufficient evidence from which the jury could have reasonably concluded Armendariz personally premeditated the murders, that conclusion was by no means foreordained. Even assuming the jurors believed Armendariz had committed all three of the prior uncharged acts testified to by Menchaca, those incidents were all distinguished by the fact that while shots were fired, *no one was actually hit by a bullet, let alone killed*. Apparently, if Armendariz was the shooter in those incidents, he was either a poor shot or was not trying very hard to hit anyone. Based on this record, the jury could have concluded that while Armendariz was a stupid kid who liked to shoot a gun, he was not a premeditated murderer.

And finally, where, as here, the jurors were given alternative theories to rely upon in deciding defendant's guilt, they need not agree unanimously by which theory he is guilty. (*People v. Santamaria* (1994) 8 Cal.4th 903, 918.) But a necessary corollary to that rule is when one of the alternative theories offered to the jury proves to be fatally flawed, and we cannot tell whether, or to what extent, the jurors relied on that flawed theory in reaching their verdict, the verdict must be reversed even if the alternative theory is sound. (*People v. Green* (1980) 27 Cal.3d 1, 69, overruled on another ground in *People v. Martinez* (1999) 20 Cal.4th 225, 234- 238.) Consequently, having determined

25

that Armendariz's conviction of *first degree* murder on count 1 cannot be justified on a direct aider and abettor theory, we are obligated to reverse that conviction without regard to whether it might have been properly arrived at on the basis of the prosecution's alternative theory.  Nonetheless, as we shall explain, we also conclude the instruction given to the jury on that alternative theory – the natural and probable consequences doctrine – was likewise insufficient to support Armendariz's conviction for first degree murder.

### b.  *Instructional error on natural and probable consequences doctrine*

As explained in *People v. Houston* (2012) 54 Cal.4th 1186, 1224, the natural and probable consequences doctrine holds that "if an accomplice aids, promotes, encourages, or instigates a confederate to commit a crime, but the confederate instead commits another, more serious crime, the accomplice may be liable for the more serious crime if it was a 'natural and probable consequence' of the crime that the accomplice intended to aid and abet."

"'Liability under the natural and probable consequences doctrine "is measured by whether a reasonable person in the defendant's position would have or should have known that the charged offense was a reasonably foreseeable consequence of the act aided and abetted." [Citation.]' [Citations]  A reasonably foreseeable consequence is a factual issue to be resolved by the jury who evaluates all the factual circumstances of the individual case." (*People v. Favor* (2012) 54 Cal.4th 868, 874 (*Favor*).)

Because the natural and probable consequences doctrine is premised on the idea that the aider and abettor intended only to commit some lesser crime, a juror who finds the aider and abettor culpable for murder under that doctrine has necessarily concluded the aider and abettor did not even *intend to commit murder*, let alone premeditate it.  Consequently, under the natural and probable consequences doctrine, the

only premeditation which might elevate an aider and abettor's liability for murder to liability for *first degree murder* would be the premeditation of the direct perpetrator.

Here, Armendariz argues that because his culpability for first degree murder under the natural and probable consequences doctrine was necessarily dependent upon *Ramirez's* premeditation, the jurors should have been required to find that Ramirez's premeditation was itself a natural and probable consequence of whatever lesser crime they believed Armendariz had intended to commit, before they could convict Armendariz of first degree murder. Because the jurors were not instructed to make that finding, Armendariz asserts his conviction for first degree murder on count 1 must be reversed. We agree.

In *Favor*, the Supreme Court addressed a similar issue in a case involving a defendant convicted of premeditated *attempted* murder under the natural and probable consequences doctrine. The defendant argued his conviction must be reversed because the jury had not been instructed to find that his cohort's premeditation must itself be a natural and probable consequence of the crime defendant himself actually intended to commit. The court rejected the contention, but on a basis not applicable here. The court reasoned that when the charged crime is *attempted* murder, the jury need not be instructed that *premeditation* is a natural and probable consequence of the lesser intended crime because there are no degrees of attempted murder and premeditation is not an element of the crime. Instead, the jury's finding that an *attempted* murder is premeditated is merely the basis for a sentence enhancement.

Here, by contrast, the murder was completed, not merely attempted, and the fact of premeditation is one of the elements which elevates what would otherwise be a second degree murder to one of first degree. (§ 189; *People v. Stevens* (2007) 41 Cal.4th 182, 203 [referring to "the premeditation element of first degree murder"]; *People v. Jurado* (2006) 38 Cal.4th 72, 118 [same].) And a determination of first degree murder subjects a defendant to a higher punishment than a second degree murder. (§ 190, subd.

27

(a).) Under these circumstances, as the United States Supreme Court recently explained, first degree murder would necessarily constitute a separate offense from second degree murder: "When a finding of fact alters the legally prescribed punishment so as to aggravate it, the fact *necessarily forms a constituent part of a new offense* and must be submitted to the jury." (*Alleyne v. United States* (2013) __ U.S. __ [133 S.Ct. 2151, 2162, 186 L.Ed.2d. 314], italics added.)

Consequently, in order for the jurors here to have properly found Armendariz culpable for *first degree* murder under the natural and probable consequences doctrine, they should have been instructed that *Ramirez's premeditation* of that murder was a necessary element of the offense. Armendariz could then be held liable for first degree murder only if *Ramirez's premeditation* were determined to be part of the natural and probable consequence of whatever lesser crime the jury determined *Armendariz himself* had intended to commit. Because the jury was not so instructed, Armendariz's conviction of first degree murder on count 1 cannot be justified on the basis of the natural and probable consequences doctrine.

*6. Sentencing Error*

Both Ramirez and Armendariz contend that the sentences imposed on them in this case constituted cruel and unusual punishment in light of their youth at the time of the crimes. They rely on *Graham v. Florida* (2010) 560 U.S. 48 [130 S.Ct. 2011, 176 L.Ed.2d 825] (*Graham*), which establishes a complete ban on imposing sentences of life without the possibility of parole ( LWOP) on juvenile offenders in nonhomicide cases, and *Miller v. Alabama* (2012) 567 U.S. __ [132 S.Ct. 2455, 183 L.Ed.2d 407] (*Miller*), which precludes the imposition of *mandatory* LWOP sentences on juveniles even in homicide cases such as this one. Although it is only Ramirez who received what is technically an LWOP sentence, both he and Armendariz also argue that sentencing a juvenile to a term of years which precludes any opportunity that he will be released from

28

prison during his lifetime likewise amounts to cruel and unusual punishment in violation of both the Eighth Amendment to the United States Constitution and article 1, section 17 of the California Constitution.

In *Graham*, the United States Supreme Court considered the propriety of Florida imposing a life sentence on a juvenile offender who committed a nonhomicide offense. As the court noted, that sentence was functionally an LWOP under Florida law, "[b]ecause Florida has abolished its parole system [and thus] a life sentence gives a defendant no possibility of release unless he is granted executive clemency." (*Graham, supra,* 560 U.S. at p. __ [130 S.Ct. at p. 2020].)

The court concluded that imposition of such a sentence constituted cruel and unusual punishment. In its analysis, the court pointed to studies reflecting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds. For example, parts of the brain involved in behavior control continue to mature through late adolescence." (*Graham*, *supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2026].) Because juveniles have a less developed moral sense than adults, the court viewed them as less morally culpable than adults who commit the same offenses. (*Id.* at p. __ [130 S.Ct. at p. 2027].) Moreover, the court also noted "[j]uveniles are more capable of change than are adults, and their actions are less likely to be evidence of 'irretrievably depraved character' than are the actions of adults." (*Id.* at p. __ [130 S.Ct. at p. 2026].) Thus, the court explained it is problematic for a sentencer "[t]o justify life without parole on the assumption that the juvenile offender forever will be a danger to society," as that requires "the sentencer to make a judgment that the juvenile is incorrigible. The characteristics of juveniles make that judgment questionable." (*Id.* at p. __ [130 S.Ct. at p. 2029].) The court emphasized "'[i]t is difficult even for expert psychologists to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.'" (*Ibid.*)

29

The court acknowledged that additional evidence developed during the juvenile's period of incarceration might be sufficient to demonstrate he is irreparably corrupted, but the mere possibility of such an outcome would not be a sufficient basis to justify imposition of such a harsh punishment on an immature offender: "Even if the State's judgment that Graham was incorrigible were later corroborated by prison misbehavior or failure to mature, the sentence was still disproportionate because that judgment was made at the outset." (*Graham, supra,* 560 U.S. at p. __ [130 S.Ct. at p. 2029].)

Finally, the court observed, on a practical level, that a life without parole sentence is particularly harsh for a juvenile offender who "will on average serve more years and a greater percentage of his life in prison than an adult offender." (*Graham, supra,* 560 U.S. at p. __ [130 S.Ct. at p. 2028].) In light of these important differences, the court determined that the Eighth Amendment requires a juvenile offender in a nonhomicide case be given a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation," a requirement which is inconsistent with imposition of an LWOP sentence. (*Id.* at p. __ [130 S.Ct. at p. 2029-2030].)

And in *Miller*, the high court relied on *Graham*'s rationale in determining that even in *homicide* cases involving juvenile offenders, a sentencing court is required "to take into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in prison." (*Miller, supra*, 567 U.S. __ [132 S.Ct. at p. 2469], fn. omitted.) In rejecting the application of a *mandatory* LWOP sentence to juvenile offenders, the court explained that such a sentence necessarily "precludes consideration of [the juvenile's] chronological age and its hallmark features – among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him – and from which he cannot usually extricate himself – no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent

30

of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth – for example, his inability to deal with police officers or prosecutors (including on a plea agreement) or his incapacity to assist his own attorneys." (*Id*. at p. __ [132 S.Ct at p. 2468].) However, the court also stated that, in homicide cases, it was "not foreclos[ing]" the ability of a sentencer to impose "this harshest possible penalty" of life without the possibility of parole on "'the *rare* juvenile offender whose crime reflects *irreparable corruption*.'" (*Id.* at p. __ [132 S.Ct. at p. 2469], italics added.)

After the case was fully briefed, we invited the parties to provide us with supplemental briefing addressing the issue of whether recently enacted section 1170, subdivision (d)(2), affects our analysis of this issue. Section 1170, subdivision (d)(2) provides, in substance, that when a juvenile is sentenced to LWOP for any offense other than one involving torture or a victim who was a public safety official, he is entitled to submit a petition for recall of his sentence after he has served at least 15 years. The petition must demonstrate the defendant's remorse and his work toward rehabilitation. The court is required to consider several factors in deciding whether to recall the sentence, and if it decides to do so, it has discretion to resentence the defendant "in the same manner as if the defendant had not previously been sentenced, provided that the new sentence, *if any*, is not greater than the initial sentence." (§ 1170, subd.(d)(2)(G), italics added.) If the court denies the petition, the offender can submit another one after serving 20 years, a third one after serving 24 years, with a final petition allowed "during the 25th year of the defendant's sentence." (§ 1170, subd. (d)(2)(H).)

With these concepts in mind, we consider the sentences imposed in this case.

### a.  The LWOP imposed on Ramirez

Ramirez was sentenced to LWOP on count 1, *plus* a consecutive term of 65 years to life.  The latter term was comprised of a mandatory consecutive 25 years to life for count 1 pursuant to § 12022.53, subdivisions (d) and (e)(1) (based on finding he committed his crime for benefit of a street gang and a principal in the crime personally used a firearm), plus a consecutive term of 15 years to life on count 2 (second degree murder), plus an additional mandatory consecutive 25 years to life for that count also pursuant to § 12022.53, subdivisions.(d) and (e)(1).  Section 12022.53, subdivision. (f), specifies that imposition of the consecutive additional term provided for in the statute is mandatory for each separate crime to which it applies.

In arguing his sentence must be reversed, Ramirez focuses primarily on the LWOP, which the trial court made clear it viewed as mandatory, and argues that such a mandatory sentence runs afoul of *Miller*.  The Attorney General counters that under section 190.5, subdivision (b), the applicable sentencing provision, the LWOP sentence is in fact not mandatory.

That being said, however, the Attorney General also concedes the trial court apparently *believed* the LWOP sentence was mandatory for Ramirez, and thus agrees the sentence must be reversed and remanded to allow the trial court to exercise discretion in deciding whether LWOP is the appropriate sentence for Ramirez on count 1.

We agree the sentence must be reversed, but note that remanding for the sole purpose of allowing the trial court to exercise discretion to choose a term of 25 years to life for Ramirez on count 1 does not accomplish much.  Even if the court did that, and actually exercised its discretion to lower Ramirez's sentence on count 1, the only optional term available to it under section 190.5, subdivision (b) is a term of 25 years to life.  And if that option were chosen, Ramirez's resulting total sentence would be modified from one of LWOP plus a consecutive 65 years to life, to one of 90 years to life – the same sentence already imposed on Armendariz.  Such a sentence, which precludes the

possibility of parole until *the entire 90 years is served* (§ 3046, subd. (b)), was characterized by our own Supreme Court as the "functional equivalent" of LWOP, and must consequently be treated *as an LWOP* for purposes of a claim asserting cruel and unusual punishment. (*People v. Caballero* (2012) 55 Cal.4th 262, 268, fn.omitted (*Caballero*).)

A limited remand which merely directs the trial court to exercise discretion in choosing whether to again sentence Ramirez to LWOP on count 1, or to instead modify his sentence on that count in a way that would still result in an overall sentence *that amounts to* LWOP, does not satisfy *Miller.* Specifically, it offers the court no opportunity to comply with *Miller*'s adjuration that its exercise of discretion in sentencing a juvenile offender must "take into account how children are different, and how those differences *counsel against irrevocably sentencing them to a lifetime in prison.*" (*Miller*, *supra* 567 U.S. at p. __ [132 S.Ct at p. 2469], italics added, fn. omitted.) We will not pretend it does.

### b. *The indeterminate term of years sentences*

The balance of the sentence imposed on Ramirez, as well as the entire sentence imposed on Armendariz, was comprised of a series of consecutive 25 years to life and 15 years to life sentences. Assuming the LWOP portion of Ramirez's sentence was reduced to 25 years to life, both sentences would total 90 years to life. As we have already explained, such a sentence, which effectively precludes a defendant from ever being paroled, must still be treated as an LWOP for purposes of analyzing whether it qualifies as cruel and unusual punishment. (*Caballero*, *supra*, 55 Cal.4th at p. 268.)

Consequently, unless these 90 years-to-life sentences were themselves the product of an exercise of discretion that "[took] into account how children are different, and how those differences counsel against irrevocably sentencing them to a lifetime in

prison" (*Miller*, *supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469], fn. omitted), they qualify as cruel and unusual punishment. We find no indication that occurred.

We acknowledge the Attorney General asserts that Armendariz's sentence did not run afoul of *Miller* because it did not amount to a *mandatory* LWOP, but the assertion provides us with no clue as to what, if any, discretion the Attorney General believes the court was able to exercise in imposing that sentence. Moreover, our record contains no indication the trial court itself *believed* it was exercising any discretion in sentencing either Ramirez or Armendariz.

When a court exercises discretion in sentencing, it is required to "state the reasons for its sentence choices on the record at the time of sentencing." (§ 1170, subd. (c).) This requirement applies not only to situations where the court exercises discretion in choosing the term to impose for any one count, but also to a court's decision to impose consecutive, rather than concurrent, terms for separate counts. (*People v. Coelho* (2001) 89 Cal.App.4th 861, 886 ["Where the court has discretion, the imposition of a consecutive, rather than concurrent, term represents a sentencing choice"]; *People v. Fernandez* (1990) 226 Cal.App.3d 669, 678 ["The most fundamental duty of a sentencing court is to state reasons justifying the sentencing choices it makes"].)

Here, the trial court did not offer *any* reasons for the sentencing decisions it made with respect to either Ramirez or Armedariz, other than its initial observations that "California is at war with gangs" and gang members should know "they are likely to be shot, killed, stabbed or end up in prison for the rest of their lives." But of course, it is well-established that a court cannot use the same factor to justify more than one sentence enhancement (§ 654; §§ 12022.53, subd.(f); Cal. Rules of Court, rule 4.425(b)(2)), and in this case, both defendants had already been subjected to mandatory additional consecutive 25 to life terms on each of the murder counts, based in part on their gang affiliation. We presume this experienced trial judge was aware of that limitation and

34

would not have relied on gang affiliation as an implied basis for further discretionary enhancement of their sentences.

But more important, the scourge of gang violence in our state does not say anything *about these juveniles in particular*, does not reflect any consideration of their youth, and does not explain why anyone should assume they were less amenable to rehabilitation than other juvenile offenders might have been expected to be. The court failed to determine that either defendants qualified as "'the *rare* juvenile offender whose crime reflects *irreparable corruption*.'" (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469], italics added.)

Because our record demonstrates that the trial court imposed what were the functional equivalent of LWOP sentences on both Ramirez and Armendariz in this case, and that it did so without exercising any discretion which took into account their youth – with its attendant immaturity and inability to appreciate risk, as well as its greater capacity for redemption – we have no choice but to reverse the sentences in their entirety.

*c. Prohibition on imposing sentence of LWOP or functional equivalent in this case on remand*

Finally, both Ramirez and Armendariz argue that in the circumstances of this case, the imposition of any sentence amounting to LWOP or its functional equivalent would qualify as cruel and unusual punishment. We agree.

We begin by noting the rationale of both *Graham* and *Miller* is grounded on the notion that juveniles are, in effect, not fully formed. As the high court explained in *Graham*, what distinguishes juvenile offenders from adults is that "[a]s compared to adults, juveniles have a '"lack of maturity and an underdeveloped sense of responsibility"'; they 'are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure'; and their characters are 'not as well formed.'" (*Graham, supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2026].) Then, as we have already

35

noted, the court then acknowledged that "[t]hese salient characteristics mean that '[i]t is difficult *even for expert psychologists* to differentiate between the juvenile offender whose crime reflects unfortunate yet transient immaturity, and the rare juvenile offender whose crime reflects irreparable corruption.' [Citation.] *Accordingly, 'juvenile offenders cannot with reliability be classified among the worst offenders.'"* (*Id.* at p.__ [130 S.Ct. at p. 2026], italics added.)

It is largely *because* these juveniles cannot "with reliability be classified among the worst offenders," (*Graham, supra*, 560 U.S. at p. __ [130 S. Ct. at p. 2026]) that the high court has restricted the efforts of the states to, in effect, do that very thing by sentencing juveniles to the harshest available sentences. And in light of the court's observation that even expert psychologists would have difficulty making reliable judgments about whether a particular juvenile offender is irreparably corrupted, we would have great difficulty presuming that even the most qualified trial judge could be expected to do so in the context of sentencing hearing which takes place while the defendant is still very young.

Fortunately, however, we also see very little reason why a trial judge in California would ever have to do that. By contrast to Florida's "no-parole" sentencing scheme with which the high court had to grapple in *Graham*, California does allow for parole – and for indeterminate life terms. A juvenile defendant sentenced to such a term – say 15 years to life, or 25 years to life – could be kept in prison for his entire natural life if his "prison misbehavior or failure to mature" demonstrates he is indeed "incorrigible," *Graham, supra*, 560 U.S. at p. __ [130 S.Ct. at p. 2029]) but he could also be paroled at the end of the term of years, or at some point thereafter, if he demonstrates maturity and rehabilitation. In other words, California allows the juvenile offender to be sentenced in such a way that the ultimate decision about whether he ought to remain in prison for life can be made – more reliably – at some later point.

Moreover, nothing we say here is inconsistent with *Miller*, in which the high court specifically refused to foreclose the possibility that an LWOP sentence could be imposed on the rare juvenile convicted of a homicide, if the "'crime reflects irreparable corruption.'" (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469].) While *Miller* did not directly address a sentencing scheme such as Florida's, where imposition of an indeterminate life sentence would not be an option, the court would nonetheless have had to consider and account for such sentencing schemes in devising a rule to be applied across *all the states*. Thus, the rule in *Miller* still leaves a state such as Florida, where the decision to imprison a juvenile offender for life must apparently be made *irrevocably* at the original sentencing hearing, or not at all, with the option to impose such a sentence in rare homicide cases.

But here, under California's indeterminate sentencing law, there is simply no reason to do that. Under our sentencing scheme, the ultimate decision to keep a juvenile offender in prison for life is a judgment which can be made at a later point, after the juvenile has had a chance to gain maturity and demonstrate rehabilitation (or not) and both he and the system have had a chance to gain valuable perspective. Given that opportunity, a sentencing decision which forecloses a juvenile offender options at the outset would appear inconsistent with both the spirit and rationale of *Graham* and *Miller*.

Further, the recently enacted section 1170, subdivision (d)(2), which applies in cases where LWOP sentences have been imposed on juvenile offenders, suggests our Legislature would concur. The Attorney General's supplemental brief addressing the provision portrays it as offering a "meaningful parole-type review of juvenile LWOP sentences." We would agree it is *intended* to do essentially that – although we would also agree with Ramirez's contention that, as a practical matter, the provision offers him little protection against his LWOP sentence, as there is no guarantee the provision would *still be in effect* in roughly 13 years when he might have had his first opportunity to utilize it.

37

But the very fact the Legislature has *enacted* that statutory provision suggests it does not endorse the imposition of unduly lengthy sentences against juvenile offenders, without at least ensuring they are afforded a meaningful opportunity to seek reconsideration of the sentence within some reasonable time, based on a demonstration of their positive character and rehabilitation. If, as the Attorney General suggests, section 1170, subdivision (d)(2) is intended to guarantee that even the most egregious juvenile offenders – those *actually sentenced to LWOP* – would have the opportunity for a "parole-type review" after serving *15 years*, it strongly suggests the Legislature would not approve the practice of imposing *theoretically lesser* sentences against juveniles which nonetheless doom those juveniles to more extended prison terms without any opportunity to petition for an earlier release based upon a similar demonstration of remorse, maturity, and rehabilitation. Thus, we conclude that section 1170, subdivision (d)(2) supports the conclusion that imposing LWOP sentences on juvenile offenders, or imposing lengthy sentences that operate as the functional equivalent of LWOP and preclude the juvenile from obtaining a parole-type review within a reasonable period of time, constitutes cruel and unusual punishment.

Finally, apart from our abstract concern – and possibly the Legislature's as well – that trial courts are simply ill-equipped to make reliable *lifetime judgments* about juvenile offenders in the immediate wake of their convictions, our conclusion that the specific sentences imposed in this case amounted to cruel and unusual punishment is also bolstered by our own Supreme Court's opinion in *Caballero.*

In *Caballero*, the court considered whether a term of 110 years to life qualified as cruel and unusual punishment when imposed on a juvenile offender who had attempted to murder three people. The circumstances in *Caballero* are similar to the ones before us here. Caballero was a young gang member who opened fire on three people he believed to be members of a rival gang, with the intention of killing them, during a single incident. Although he did not kill his victims, Caballero's attempt was serious, and he

38

did manage to shoot one of his victims in the back. He was convicted of three counts of attempted murder, and sentenced to a series of consecutive terms of 15, 20 and 25 years to life; added together, the consecutive terms totaled 110 years to life.

The most significant distinction between that incident and the one before us is that no one was killed. And that is a big distinction. However, it is not a distinction that actually bears upon the relative *culpability* of these juvenile offenders. In fact Caballero and Ramirez were similarly culpable in that they both intended to kill rival gang members without significant provocation when they pulled the trigger. Armendariz, by contrast, appears to be significantly less culpable than either, because he did not even point a gun at anyone, let alone pull the trigger with the intent to kill, during the incident for which he was convicted. (*See, Caballero, supra*, 55 Cal.4th 268-269 [noting that *Graham* requires a sentencing court to "consider all mitigating circumstances attendant in the juvenile's crime and life, including but not limited to . . . whether the juvenile offender was a direct perpetrator or an aider and abettor"].)

But despite the seriousness of Caballero's crimes, the Supreme Court determined that a sentence of 110 years to life, which operated as the functional equivalent of LWOP, constituted cruel and unusual punishment. And although the Attorney General suggested that Caballero's intent to kill his victims meant his crime should qualify as one which at least merited a *discretionary* consideration of LWOP under *Miller*, the court dismissed the suggestion. Instead, it pointed to language in *Miller*, where the high court "observed that 'none of what [*Graham*] said about children – about their distinctive (and transitory) mental traits and environmental vulnerabilities – is crime-specific. Those features are evident in the same way, and to the same degree, when . . . a botched robbery turns into a killing. So *Graham*'s reasoning implicates any life-without-parole sentence imposed on a juvenile, even as its categorical bar relates only to nonhomicide offenses.'" (*Caballero, supra*, 55 Cal.4th at p. 267.) Implicitly then, the court seemed to recognize that the mere fact a juvenile gang member actually

39

intended to kill rival gang members – without more – would be an insufficient basis to support the determination that he is "'the *rare* juvenile offender whose crime reflects *irreparable corruption.*'" (*Miller, supra*, 567 U.S. at p. __ [132 S.Ct. at p. 2469], italics added.)

For all of the foregoing reasons, we conclude the sentences handed down in this case constituted cruel and unusual punishment. Moreover, on remand, the court is directed to exercise its discretion to impose sentences which ensure these juvenile defendants have a meaningful opportunity to demonstrate rehabilitation and potentially obtain their release within a reasonable period of time.

DISPOSITION

We affirm Ramirez's convictions on all counts, but reverse Armendariz's conviction of first degree murder on count 1. We also reverse the sentences imposed on both defendants. We remand the case to the trial court for further proceedings with respect to count 1 against Armendariz, and direct the court to (1) resentence Ramirez to a term which allows him a meaningful opportunity to obtain release within a reasonable period based on demonstrated maturity and rehabilitation; and (2) resentence Armendariz to a term which allows him a similar opportunity, after it resolves count 1 alleged against him.

**CERTIFIED FOR PUBLICATION**

RYLAARSDAM, ACTING P. J.

I CONCUR:

MOORE, J.

40

Aronson, J., concurring and dissenting:

I concur in the majority's well-reasoned opinion in all respects except for one important aspect of resentencing. I agree Ramirez must be resentenced because the record reflects the trial court believed the life without parole sentence (LWOP) it imposed was mandatory, a conclusion violating constitutional norms for juvenile defendants as the high court explained in *Miller v. Alabama* (2012) 567 U.S. __, 132 S.Ct. 2455 (*Miller*). I also agree the trial court may not simply resentence Ramirez to the alternate term of 25 years to life in lieu of an LWOP on count 1, and that Armendariz must be resentenced. Specifically, while we ordinarily presume the trial court understood and properly exercised its sentencing discretion, the trial court's explanation of Armendariz's and Ramirez's lengthy sentences based solely on California's general "war on gangs" demonstrates a complete absence of the individualized consideration necessary to conclude a youthful homicide defendant is irredeemable. (*Miller*, at p. 2469; cf. *Enmund v. Florida* (1982) 458 U.S. 782, 798 [individual consideration essential in imposing harshest possible penalty, especially on aider and abettor]; see also *People v. Penoli* (1996) 46 Cal.App.4th 298, 305-306 [reversal required "when the court's comments disclose that it failed to pass on the merits of the issue [citation], or that its ruling embodied, or rested upon, a misunderstanding of the relevant law [citation] or an arbitrary or irrational point of view"].)

Here, the court's comments about gangs generally instead of focusing on defendants' individual prospects for reform suggest "a categorical preference for its own policy analysis" (*Penoli*, *supra*, 46 Cal.App.4th at pp. 305-306) rather than a "case-specific application of sentencing discretion" (*id*. at p. 303). Granted, the trial court did not have the benefit of the high court's *Miller* opinion at the time of sentencing. But it is

1

now established the government may not impose the harshest possible penalty on a youthful offender without passing on the merits of each juvenile's individual potential to redeem himself. (*Miller*, *supra*, 132 S.Ct. at pp. 2468-2469 [mandatory LWOP unconstitutional because it precludes individualized consideration of youthful characteristics].) Imposing an LWOP on Ramirez and a virtual LWOP on Armendariz as the trial court did here without any exercise of judicial discretion is the functional equivalent of mandatory LWOP sentencing, and therefore barred under *Miller*. Consequently, the matter must be remanded for resentencing.

I part ways with the majority simply because we lack the necessary information to assess whether these defendants are capable of redemption. The parties below did not develop a record exploring the issues discussed in *Miller*. It is impossible for us to know in advance of resentencing what the evidence will show of defendants' corrigibility. Simply put, the parties should be given an opportunity to address these issues.

Whether the Constitution in every conceivable instance forbids a court from imposing LWOP or a virtual LWOP on a juvenile homicide offender is a difficult, unsettled question. It is not enough that a sentence of 90 years to life for each defendant amounts to "the 'functional equivalent' of LWOP, and must consequently be treated *as an LWOP* for purposes of a claim asserting cruel and unusual punishment" (Maj. opn., *ante*, original italics), citing *People v. Caballero* (2012) 55 Cal.4th 262, 268. *Caballero* involved nonhomicide offenses. Our Supreme Court in *Caballero* expressly did not consider or hold that an LWOP or its functional equivalent may not be imposed on a juvenile who commits murder. (*Id.* at p. 268, fn. 4.) And the high court in *Miller* expressly declined at that time in its jurisprudence to foreclose the possibility LWOP might be imposed for homicide on "'the *rare* juvenile offender whose crime reflects

2

*irreparable* corruption.'" (*Miller*, *supra*, 132 S.Ct. at p. 2469, italics added.) No court until now has reached the majority's conclusion, and there is no reason to do so now. As our Supreme Court long ago observed, "A court will not decide a constitutional question unless . . . absolutely necessary." (*Estate of Johnson* (1903) 139 Cal. 532, 534.)

The trial court's sentencing choices on remand may moot any constitutional question. Indeed, there is no pending constitutional issue *until* the trial court resentences defendants, and the court may do so in a way that no constitutional issue arises. In view of the constitutional interests at stake, for example, the trial court may choose the default option under Penal Code section 669 for concurrent sentencing on counts 1 and 2, thereby ensuring defendants' parole eligibility after a lengthy sentence. Alternatively, despite the statutory mandate requiring a consecutive 25-years-to-life gun enhancement on both counts 1 and 2 (Pen. Code, § 12022.53, subds. (d), (e)(1) & (j)), the trial court may conclude a higher constitutional command authorizes it to strike the enhancements. All these myriad evidentiary and sentencing outcomes should remain open on remand, and I therefore dissent from the majority's implicit, contrary conclusion.


ARONSON, J.